# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DAVID ARREDONDO,**

                    **Petitioner,**

         **v.**                                              **Case No. 05-C-559**

**WILLIAM POLLARD,**

                    **Respondent.**

---

## DECISION AND ORDER

Petitioner David Arredondo, a Wisconsin state prisoner, seeks a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  He is challenging his state court conviction of first-degree

intentional homicide and second-degree sexual assault.  As grounds for relief, petitioner

claims that:  (1) he was deprived of his constitutional right to testify in his own defense; (2) his

trial counsel was ineffective; and (3) he was sentenced based on an improper factor.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The state court of appeals summarized the facts as follows:

> David Arredondo was charged with sexually assaulting and killing
> Desiree Klamann.  According to witnesses, Klamann was last seen alive with
> Arredondo at the Cinco de Mayo festival on May 4, 1997.  Her naked and
> beaten body was found wrapped in a comforter in a garbage dumpster on May
> 8, 1997. The police discovered Arredondo's semen on the comforter and found
> Klamann's blood on the molding in Arredondo's bedroom.  The police also saw
> that someone had recently painted half-way up the walls of Arredondo's
> bedroom.  They sprayed luminol, a chemical designed to detect blood that is
> not otherwise visible to the unaided eye, on the walls and discovered blood
> underneath the paint.
>
> Arredondo pled not guilty and went to trial.  The State called several witnesses,
> including Arredondo's former roommate, Thomas Garza.  Garza testified that,
> on May 4, 1997, he got back to the apartment he shared with Arredondo around
> 9:30 or 9:45 p.m.  While Garza was in the kitchen getting a drink, he saw

Arredondo run naked from his bedroom to the bathroom. According to Garza, he laughed and asked Arredondo what was going on. Arredondo told Garza that he had to "take a leak" and could not wait. After Arredondo returned to his bedroom, Garza went to his own bedroom, watched television in bed, and fell asleep. Garza testified that he heard a woman's voice while he was sleeping, but was not sure where the voice came from because his television was still on.

The State also called as a witness Arredondo's former cellmate, Kurt Moederndorfer. Moederndorfer testified that, while he shared a cell with Arredondo at the Milwaukee County Jail, Arredondo told him about the crime. According to Moederndorfer, Arredondo met a woman at the Cinco de Mayo festival. Arredondo and the woman spent the day together drinking and having a "good time." Moederndorfer testified that Arredondo convinced the woman to go home with him, took her into his bedroom, and "tried to make his moves on her." Arredondo told Moederndorfer that, when the woman resisted, he grabbed her by the throat, choked her, and forced her to have sexual intercourse with him. When Moederndorfer asked Arredondo if the police had any evidence, Arredondo replied: "I took care of that . . . . I painted the walls in the bedroom and got rid of a mattress and some kind of old rug . . . in a dumpster."

(Answer Ex. E ¶¶ 2-4.)

At trial, after the state rested, the court excused the jury and engaged in the following colloquy with petitioner's counsel and petitioner regarding whether petitioner would testify:

THE COURT: . . . . It is my understanding the defense has two very brief witnesses to present before lunch and then the defendant will at that time make a decision about testifying. Is that right?

MR. SCHATZ; That's correct.

THE COURT: Has any preliminary decision been made in that regard?

MR. WILLIAMS: Let's make the record before lunch if we can.

THE COURT: I'd like to so we know what we're doing over the lunch break, so the decision should be made before the lunch break. It is my understanding the defendant has elected not to testify although wants to reserve the right to change after these two witnesses testify. Is that right?

MR. SCHATZ: The defendant's elected not to testify, Your Honor.

THE COURT: And that's a definite decision?

MR. SCHATZ: That's a definite decision. I would say 99% definite. I don't expect anything from these two witnesses that would change his mind, but you never know.

THE COURT: We can address it again after the witnesses testify, but let me confirm with you, Mr. Schatz, that you have discussed the defendant's options with him in that regard.

MR. SCHATZ: I have, Your Honor.

(Trial Tr. 109 at 47-48.)

The court then questioned petitioner as follows:

THE COURT: And Mr. Arredondo, I need to confirm with you that you have discussed your decision regarding testifying in this case with your counsel and the options that you have in that regard. You have done so?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You understand that you have an absolute constitutional right not to testify in this case and if you decide, as evidently you have decided, not to testify in this case, the jury will be instructed that they cannot hold that against you. They cannot draw any conclusions from that. Do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you also understand, Mr. Arredondo, that you have a corresponding right to testify and take the witness stand in your own defense. If you do that, you would be subjecting yourself to cross-examination. Do you recognize that as well?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Knowing that you have these corresponding rights and how they apply here and in consultation with your counsel, you have made the decision not to testify in this case, correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And although that decision has been made in consultation with your counsel, it is nonetheless, your own decision; is that correct?

THE DEFENDANT: Yes, Your Honor.

-3-

THE COURT: All right. Let's proceed.

(Id. at 48-49.)

Petitioner then presented two witnesses after which his counsel stated that petitioner rested. The court made no further inquiry regarding whether petitioner would testify. The prosecutor indicated that the state would not present rebuttal testimony. The court then advised the jury that the evidentiary phase of the trial was complete and recessed for lunch.

Immediately after lunch, petitioner advised the court that he wished to testify:

THE COURT: All right. The record should reflect we are now back on the record. . . .

THE DEFENDANT: Your Honor, excuse me, Your Honor. I did not understand very well about when you were asking me the questions. My attorney advised me to say yes, but I didn't understand the question that I was yes-ing to when we ended about an hour or two hours ago.

. . . .

THE COURT: You're changing your mind about your decision to testify?

THE DEFENDANT: Yes, ma'am.

. . . .

THE DEFENDANT: Yes, I did not understand. When you were asking me about the rights or whatever about testifying –

THE COURT: Right.

THE DEFENDANT: I did not understand. And I need to take that back, the yes answer that I gave you and tell you no, I do need to testify because the only one that can defend David Arredondo today is David Arredondo.

THE COURT: Have you talked to your attorney about this?

THE DEFENDANT: I told him and he said no, I could not, but we had an argument earlier this afternoon when I was telling him about it, and he said he didn't give a shit what I did at this point, and I took it as he was not letting me understand what he was coming from.

-4-

THE COURT: All right. Mr. Schatz.

MR. SCHATZ: Your Honor, that's entirely false. Since the end of court and, of course, I can't discuss whatever Mr. Arredondo and I discussed in confidence. We have discussed quite a bit about whether he would take the stand and testify or not. I told him what the ramifications would be. We discussed it quite a bit this morning in closed quarters even during the trial. All I can say is Mr. Arredondo made the decision not to testify. I concur in that decision –

THE DEFENDANT: With his help, Your Honor. He told me you're not testifying and I was confused. I did not know – I did not understand, ma'am.

THE COURT: I don't want to get involved or in the middle of a dispute between attorney and client, but I need to make a record of what has transpired. Evidently you have changed your mind at this point in your decision not to testify in this case. Evidently that's also against advice of counsel apparently, and I don't know if the state has a position on that.

MR. WILLIAMS: They rested.

THE COURT: True.

MR. SCHATZ: That's right. And all if can say is, Your Honor, I rendered my advice, my professional advice to Mr. Arredondo not to testify. This is not something that just came about this morning. This is something which has been – which we have discussed – which we have discussed throughout my representation with him and throughout the day and throughout yesterday.

Regarding Mr. Arredondo not understanding or that he never saw me again after, your bailiffs can certainly – your bailiffs can certainly attest to the fact that after we broke this morning, I was in the back with Mr. Arredondo while he was in the bullpen. We met back there this morning after we broke for maybe 20 minutes, half an hour. I fully explained everything to him at that point as far as whatever questions he may have. I believe I've answered all the questions.

Regarding lesser included offenses, as was stated earlier, I don't believe there is anything in the record to justify –

THE COURT: I don't think that's the issue at this point.

THE DEFENDANT: I did not understand –

MR. WILLIAMS: What maybe I would ask is we take a break and Mr. Schatz and Mr. Arredondo go back and see if they can resolve their difference.

-5-

THE COURT: That's what I would suggest. Why don't you have a brief conversation in the bullpen about this issue, and counsel and I will talk about the change in this turn of events. We'll be in recess.

(Long recess)

THE COURT: All right. We're back on the record. . . . I need to confirm with you, Mr. Arredondo, whether it is still your intention to attempt to revoke your previously made decision to not testify in this case. Is that still your intention at this time?

THE DEFENDANT: It is my intention to testify, yes, Your Honor.

THE COURT: All right. And you discussed this further during this recess with your counsel, Mr. Schatz; is that correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Mr. Schatz, is that correct, you discussed that with your client?

MR. SCHATZ: Yes, it is, Your Honor. He did express his desire to me to essentially reopen the defense case and be allowed to testify.

THE COURT: All right. I need to inquire about certain things, first of all. I have during this recess attempted to find some Wisconsin case law on this situation, and I have not been successful in doing so. I haven't found any case law that governs an attempt to revoke a previously made decision not to testify, and I don't believe there is any Wisconsin case law on that point based on my limited and brief search over the course of the last 45 minutes or so. In any event, it seems to me to be controlled by a couple different factors.

Number one, whether the defendant's previously announced decision was knowing and voluntary and was a knowing and voluntary waiver of the constitutional right to testify.

And number two, what prejudice there would be to the state and the system if allowing the defendant – if the court allowed the defendant to revoke that decision. So it depends on those various factors.

I have also had the court reporter transcribe the discussion and colloquy on the record that I had with the defendant concerning his right to testify or not to testify in this case, and I have also taken the liberty of consulting the previous transcript of the trial in the Kim Strandberg episode at which the defendant

-6-

elected to testify, and I had practically the same discussion and colloquy on the record with the defendant at that time.

During the course of this trial when I did elicit from the defendant his decision in this regard, he made an unequivocal decision that it was his decision not to testify in this case and that he made it in consultation with counsel, but it was, nonetheless, his decision, and he understood what his options were in that regard. There was a qualifier put on that by counsel having to do with this being a 99 percent decision, that he might change his mind after the two defense witnesses testify, but that wasn't anticipated.

The record should reflect that I observed a conversation between attorney and client after the two defense witnesses testified which appeared to be a conversation concerning the defendant's previously made decision not to testify and whether that was still the case, and then the record reflects that the defense rested. I need to confirm, Mr. Schatz, that that is indeed what was occurring during that very brief off the record consultation between you and Mr. Arredondo before you rested your case. Is that correct?

MR. SCHATZ: Before I answer that, Your Honor, the brief conversation Mr. Arredondo and I did have was still governed at that point by attorney-client privilege, so I can, if that privilege, if that privilege for that very limited perhaps 15, 20 second discussion or whatever it was is waived, I can state for the record what it was about.

THE COURT: Mr. Arredondo? Well, I would construe the present situation to constitute a per se waiver of the attorney-client privilege for this limited purpose. The defendant is maintaining at this time that he didn't know what he was doing when he waived his right to testify in this case, and so in that sense we are in almost a postconviction type posture in which a waiver of the attorney-client privilege for the limited purpose of inquiring into what transpired between attorney and client is deemed made by the defendant, so that is the situation I will find that we are in and ask you to confirm or deny, whichever is the case, that that is indeed what was discussed.

MR. SCHATZ: I will consider that to be a court order. Yes, after the last defense witness testified, and I believe that was Mr. Erwine, and he left the witness stand just before resting, I did make a final confirmation with Mr. Arredondo. I asked him this is the last chance, are you sure you do not want to testify. He said, "I don't want to testify." At that point we rested.

THE COURT: All right. With that supplementation of the record, I need to know, Mr. Williams, what your situation is as far as prejudice to the state by the defense attempt or the defendant's attempt to reopen his case and take the witness stand in his own defense in this case.

-7-

MR. WILLIAMS: The witnesses were released, and whether they can be relocated or not, I believe they probably could. I don't know what difficulty there would be. I know we've relocated some of the witnesses, but that's basically the posture we're in. We released the witnesses at noon.

THE COURT: So at this point not all of the potential rebuttal witnesses have been relocated.

MR. WILLIAMS: All of them have not been relocated at this point.

THE COURT: All right. And it was my understanding that there would be upwards of 10, perhaps as many as 15 rebuttal witnesses.

MR. WILLIAMS: The possibility exists of about 10 rebuttal witnesses.

THE COURT: All right. It also should be noted that we have a sequestered jury in this case which now has been kept waiting in the jury room for the totality of the afternoon so for almost three and a half hours while these issues were discussed and while we were preparing jury instructions to proceed to the final phase of the case, so that's also a significant factor.

Based on my review of the transcript of this proceeding and what the defendant indicated to me in a very unequivocal fashion was his decision and his firm decision not to testify in this case made in consultation with counsel and with the full awareness of all his options in that regard, and based on my review of the transcript of his prior trial where he made a different sort of decision but based on similar consultation with counsel and a similar colloquy with me concerning that issue, and based on what has just been made as a supplementation of the record by Mr. Schatz as to what transpired between attorney and client before the defense finally rested its case in this matter, I will find the defendant made a knowing and voluntary and irrevocable decision not to testify in this case, and his request to reopen his case in order to take the witness stand and testify in his own defense is denied. This is also based on the substantial prejudice that would exist to the state and the system and the sequestered jury in order to reopen the case at this time. I think the defendant knew full well what he was doing –

THE DEFENDANT: You're wrong, Your Honor. I did not know.

THE COURT: His decision to testify or not to testify in this case, that decision is not capable of being revoked, so your request, Mr. Arredondo, in this regard is denied. It is, however, too late in the day to proceed with closing arguments, so we will recess until 9 o'clock tomorrow morning at which time we will proceed with instructions and closings.

-8-

MR. SCHATZ: One thing for the record, Your Honor, before we close.

THE DEFENDANT: Ineffective counsel.

MR. SCHATZ: My client did have one concern, and just for the record, all chambers conferences between Mr. Williams, myself, and Your Honor have been doing nothing more than discussing issues of law, jury instructions and the like. Do you concur, Mr. Williams?

MR. WILLIAMS: Yes.

MR. SCHATZ: And I imagine you concur, Your Honor.

THE COURT: Yes, we have been spending this time or I have been spending this time looking for Wisconsin case law for guidance on this issue and weighing the options and the issue of whether or not the defendant knowingly and voluntarily made his decision not to testify in this case and also considering the prejudice that existed to the state, and the decision's been made. We'll see you tomorrow morning at 9 o'clock to proceed with the final phase of the trial.

MR. WILLIAMS: The only other thing, I think Mr. – I don't know if the court would deem it a waiver for time privileges, but Mr. Schatz I think could perhaps go through a history of how he's advised the defendant of his right to testify.

THE COURT: We can do that briefly. I don't think it's substantially necessary. It's something that may or may not be litigated at a later date, but if you wish to make a brief record of when you've discussed this issue with him.

MR. SCHATZ: Well, Your Honor, the only thing –

THE DEFENDANT: Never came and visited me. How is he gonna –

MR. SCHATZ: Your Honor, in response to Mr. Arredondo's statement, there are certainly records at the Milwaukee County Jail. People have to show identification to come in and out. Attorney visits, the like –

THE DEFENDANT: Ineffective counsel, that's what it is.

MR. SCHATZ: I have absolutely no doubt that if anybody were to check the jail records, they will find a record of every visit I have made to Mr. Arredondo. I have received collect telephone calls at my phone from Mr. Arredondo. We have discussed this entire week regarding his decision of whether to testify, whether not to testify. I have offered my professional opinion that I don't believe he should. I have advised him –

-9-

THE DEFENDANT: Told me not to today, not to testify. I wanted to testify. He told me not to testify. He says no, they're gonna find you guilty, and I don't want to swear in the courtroom, but that's what he said to me today, Your Honor. I wanted to testify and tell the Klamann family and the jury that I'm not guilty of this. I'm sorry, Your Honor, but you're being very unfair denying it.

THE COURT: Anything else, Mr. Schatz?

MR. SCHATZ: Very briefly. Every time I have discussed Mr. Arredondo's decision to testify as well as options –

THE DEFENDANT: He lies. Lies. Lies.

MR. SCHATZ: – as well as options any criminal defendant has, it's always been my practice, however, long I have practiced law, 13 years now, I have explained to every single client there are certain decisions which only you can make in any type of a criminal trial. I will give you my advice of what I feel you should do and tell you why – what I base my advice upon, but the ultimate decision is yours, and that's what happened in this –

THE DEFENDANT: Why you got to continue to lie in front of –

THE COURT: The record's been made. We're in recess until 9 o'clock tomorrow morning.

THE DEFENDANT: Lies. I'm innocent. And I can prove it to you guys.

(Proceedings adjourned to January 9, 1997 at 9 o'clock a.m.)

(Id. at 70-83.)

The next morning, petitioner's counsel stated that Craig Pradarelli, a private investigator, had joined him at counsel table:

THE COURT: It's my understanding that the reason that he is presently at counsel table is because your wish to supplement the record, Mr. Schatz –

MR. SCHATZ: That's correct.

THE COURT: – that we made yesterday afternoon, in particular concerning certain accusations at the level of preparedness and the amount of time that was put to the preparation of this case in particular as it relates to his decision to testify or not to testify.

-10-

MR. SCHATZ: That's correct.

THE COURT: Go ahead.

MR. SCHATZ: First, Your Honor, as I stated, Mr. Pradarelli was approved and appointed by the state public defender's office to assist me on this case.

It's my understanding that Mr. Pradarelli met with Mr. Arredondo twice during the preparation of this case. I also met with him twice during the preparation. It's my understanding of course that Mr. Arredondo gave whatever certain information to Mr. Pradarelli which he did follow up on; that Mr. Pradarelli gave me all the results of his investigation and his follow-up and they were factored into the trial preparation and assistance in this case.

I would also state for the record that besides meeting with Mr. Arredondo twice, special visits in the jail, I also met with him whenever we were here in court; I believe there were three court appearances prior to trial here in court. I've also spoken to him via collect telephone calls both in my office and at my home, I don't know the exact number of times; a fair estimate, I would say about a dozen if not more. Mr. Arredondo and I have discussed in detail over the course of preparing for this trial in detail many, many times about his right to testify, his right not to testify. Specifically more this week during the trial, we have discussed every day his right to testify.

I believe that based on – Well, based on information that Mr. Williams offered to me earlier in the week, which was in fact true, certain evidence that he may or may not use and then he told me he made a decision not to use, we've – I've discussed with Mr. Arredondo and I believe it was as early as Tuesday or Wednesday this week that the decision was made not to testify. Even though every day I still discussed with him his right to testify, that decision did not change since Tuesday or Wednesday of this week, and as stated yesterday on the record at the end of the day just before the defense rested, you did note that Mr. Arredondo and I had a brief conference, a brief, a brief conference here at counsel table. I confirmed with him, I said "Essentially this is your last chance. Do your or do you not want to testify." He indicated he did not want to testify –

THE DEFENDANT: That's a lie.

MR. SCHATZ: – then we rested.

THE COURT: All right.

Mr. Pradarelli, has Mr. Schatz correctly stated those facts for the record here insofar as they relate to you and your investigation and work on the case?

-11-

MR. PRADARELLI: He has.

THE COURT: And the record can also reflect, which is clear from the court file but I think we need to make a record of it here, Mr. Schatz's successor also – and this was originally set for trial, and Attorney Deja Vishny of the public defender's office represented Mr. Arredondo from the commencement of the case up to and through the first trial date which had to be adjourned due to a conflict of interest that arose with Ms. Vishny's continued representation of the defendant which the defendant refused to waive, and so most of the preparation and investigation of this case was done by predecessor counsel which you then seceded to Mr. Schatz, correct?

MR. SCHATZ: That's correct, Your Honor. I should also state just further, when I did take over the case from Ms. Vishny, I did get the defense file which was essentially pretty much of a banker's box full of discovery. There was also some additional materials and some additional pretrial work and discussions and such which I did obtain from Ms. Vishny which could only have been obtained from her with a special authorization from Mr. Arredondo that was drafted and he did sign. I did forward that to Ms. Vishny. She then forwarded me the rest of the file which comprised of a vast amount of investigative work, other people she consulted with and so forth.

THE COURT: Mr. Williams, any further record you wish to make on this?

MR. WILLIAMS: No.

THE COURT: I think the record should be very clear, to the extent it wasn't made clear yesterday, that I regard Mr. Arredondo's conduct yesterday afternoon on this issue of whether to testify or not to testify simply another attempt to manipulate rather than any change of heart or any misunderstanding.

There is no support for your claim, Mr. Arredondo, that you misunderstood, and there is no support for your claim that you were doing what your attorney told you and not what you wanted to do. The record fully supports my conclusions in this regard. You told me directly and in an unequivocal fashion that you did not wish to testify.

THE DEFENDANT: Let me prove my opinions to –

THE COURT: Mr. Arredondo, you may not interrupt me nor anyone else in this courtroom or I will have to eject you from the courtroom if you continue with this behavior. Is that clear?

THE DEFENDANT: Yes, Your Honor.

-12-

THE COURT: There was no honest change of heart in this case. This is an attempt to manipulate the justice system.

THE DEFENDANT: No.

THE COURT: I'm not through. If you interrupt again, I will eject you from the courtroom.

The defendant was fully advised of his rights in this regard both by me and by his counsel. He was advised of the same rights in the prior trial involving Kim Strandberg who testified in this case. He represented in the prior trial a full understanding of his rights to testify or not to testify in that matter. His attorney represented on the record in that matter that he fully understood his rights and options in that regard, and I am fully satisfied that the defendant understands what the situation was, understood what the situation was, made an informed, knowing and voluntary decision in that regard, which under the circumstance can lead only to the conclusion that this is theatrics and that this is playing for the cameras, perhaps, and that this is a gross attempt to manipulate the system and I cannot allow it under the circumstances. This is not simply an honest change of heart under any stretch of the imagination.

So the record should be very clear on that point for any future appellate purposes.

Anything anyone else wishes to add?

MR. WILLIAMS: No, Judge.

MR. SCHATZ: No, Your Honor.

(Trial Tr. 110 at 2-8.)

As previously indicated, the jury subsequently found petitioner guilty of both the homicide and sexual assault charges. Wisconsin law required the court to impose a life sentence on the homicide conviction but gave the court discretion to determine when defendant would become parole eligible. The court sentenced defendant to life without the possibility of parole on the homicide charge and twenty years consecutive on the sexual assault charge. During sentencing, the court noted:

-13-

And we are all to be thankful to the police department for that work because without that, you would be getting off the hook in this case as I believe you got off the hook unfairly and unjustly in the previous case having to do with Kate Strandberg. And I am absolutely convinced that that verdict in that case was wrong. And while we must accept it because it was the result of a proper trial and it was the jury's prerogative to issue that verdict, that does not mean we have to agree with it. And I did not and do not agree with it.

(Trial Tr. 112 at 17.)

The judge subsequently referred again to the Kim Strandberg sexual assault case that she had tried two years previous in which the jury acquitted:

And as I've already indicated, that verdict must be accepted but that does not compel me to agree with it. And I think it is absolutely fair for me to consider what I heard in that case which was repeated in this case when Ms. Strandberg was given permission to testify as a victim of a prior act on your part as being relevant to it. She went through her pain as well, and I think it is fair for me to consider that as well.

(Id. at 19.)

Subsequently, petitioner filed a postconviction motion alleging that his trial counsel was ineffective. The postconviction court held a hearing pursuant to State v. Machner, 92 Wis. 2d 797 (Ct. App. 1979), and denied the motion.

With respect to the Machner hearing, the court of appeals stated that:

Arredondo's attorney testified that Arredondo never told him before the defense rested that he wanted to testify. In contrast, Arredondo claimed that he told his attorney that he had to testify to prove his innocence. The postconviction court adopted the State's proposed finding that Arredondo told his attorney after the defense witnesses had testified that he still did not want to testify.

(Answer Ex. E ¶ 16.)

The court of appeals affirmed petitioner's conviction and the denial of his postconviction motion. One judge concurred with the majority of the court's decision but

-14-

dissented from the disposition of petitioner's sentencing claim and would have remanded for resentencing. The state supreme court denied review.

I will discuss the court of appeals's decision in greater detail in the course of the decision.

## II.  STANDARD OF REVIEW

A federal court may grant habeas relief to a state prisoner who is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Because petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the AEDPA standard of review governs his claims. Ouska v. Cahill-Masching, 246 F.3d 1036, 1044 (7th Cir. 2001). AEDPA limits a federal court's authority to grant habeas relief to a person who is being unlawfully held in custody. Under AEDPA, I may grant relief only if the state court decision under review was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); involved an "unreasonable application" of such clearly established law, 28 U.S.C. § 2254(d)(1); or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

A state court unreasonably applies Supreme Court precedent when it "identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Dixon v. Snyder, 266 F.3d 693, 700 (7th Cir. 2001) (quoting Williams v. Taylor, 529 U.S. 362, 407 (2000)). "[A]n

-15-

unreasonable application is different from an incorrect one." Bell v. Cone, 535 U.S. 685, 694 (2002) (citing Williams, 529 U.S. at 409-10). Under the unreasonable application prong of the habeas statute, "substantial deference is due state court determinations." Searcy v. Jaimet, 332 F.3d 1081, 1089 (7th Cir. 2003). Thus, I must uphold the state court decision if it is "'at least minimally consistent with the facts and circumstances of the case . . . even if it is not well reasoned or fully reasoned, or even if it is one of several equally plausible outcomes.'" Id. (quoting Schaff v. Snyder, 190 F.3d 513, 523 (7th Cir. 1999)).

### III. DISCUSSION

**A. Right to Testify**

**1. Whether Petitioner Waived his Right to Testify**

Petitioner contends that he did not knowingly and voluntarily waive his right to testify. He asserts that when he rested, the trial court should have conducted a second colloquy with him to ensure that he knowingly and voluntarily waived his right to testify. However, the Supreme Court has never held that the Constitution requires either that a trial court engage in a personal colloquy with a defendant about whether he wishes to testify or elicit a formal waiver of the right to testify. And, in fact, the Seventh Circuit has held that a trial court need not do either. United States v. Brimberry, 961 F.2d 1286, 1289-90 (7th Cir. 1992). In the present case, after presenting two witnesses, petitioner's counsel advised the court that petitioner rested. No Supreme Court decision required the court to make a second inquiry about whether petitioner wished to testify. Based on his having rested, the court could reasonably conclude that petitioner waived his right to testify.

-16-

Alternatively, petitioner asserts that, after he rested, he made clear to the trial court that he had not knowingly and voluntarily waived the right to testify, and thus the court should have reopened his case and permitted him to testify on that basis. However, the trial and postconviction courts found that prior to requesting to testify, petitioner had knowingly and voluntarily waived the right to do so. The trial court based this finding on the colloquy that it conducted with petitioner before he called his two witnesses and on the representations of petitioner's counsel that he advised petitioner of his right to testify and that petitioner declined to exercise it. The court of appeals adopted these findings. These are findings of fact that I presume correct, and they are not unreasonable. See § 2254(e)(1)

### 2. Whether Trial Court was Required to Permit Petitioner to Revoke His Waiver

Petitioner next argues that by upholding the trial court's refusal to grant his request to reopen the testimony to enable him to testify, the court of appeals unreasonably applied Rock v. Arkansas, 483 U.S. 44 (1987). In Rock, the Supreme Court held that "the right to testify on one's own behalf in defense of a criminal charge is a fundamental constitutional right." Id. at 53 n. 10. Such right is implicit in the Fifth, Sixth and Fourteenth Amendments. Underwood v. Clark, 939 F.2d 473, 475 (7th Cir. 1991). The right to testify is personal to the defendant and may not be waived by counsel. Jones v. Barnes, 463 U.S. 745, 751 (1983); United States v. Curtis, 742 F.2d 1070, 1076 (7th Cir. 1984).

In Rock, the Court also stated that a defendant's right to testify is not without limitation and must sometimes "'bow to accommodate other legitimate interests in the criminal trial process.'" Rock, 483 U.S. at 55 (quoting Chambers v. Mississippi, 410 U.S. 284, 295 (1973)). Nevertheless, "restrictions of a defendant's right to testify may not be arbitrary or

-17-

disproportionate to the purposes they are designed to serve." Id. at 56.  Thus, Rock establishes a methodology for reviewing a decision denying a defendant's request to testify. The reviewing court asks whether the reasons given for the denial are sufficiently persuasive to justify depriving the defendant of his fundamental constitutional right to testify.  It appears that the principal ground on which a trial court may deny a defendant's request to testify is if the timing of the request is such that granting it would "prejudice the prosecution" or "interfere with the orderly flow of the trial."  Ortega v. O'Leary, 843 F.2d 258, 262 n.4 (7th Cir. 1988).

In the present case, the court of appeals gave several reasons for upholding the trial court's denial of petitioner's request.  It noted that courts have discretion as to whether to reopen the evidentiary phase of a case.  It cited the trial court's determination that "'substantial prejudice . . . would exist to the state and the system and the sequestered jury in order to reopen the case at this time.'" (Answer Ex. E ¶ 20 (quoting Trial Tr. 109 at 79-80).) It also cited the trial court's statement that petitioner voluntarily decided not to testify and was attempting "to manipulate the system."  (Id. (quoting Trial Tr. 110 at 8).)  Finally, it presumed that petitioner did not establish that his testimony had value but "simply told the court that he wanted to testify because 'the only one that can defend David Arredondo is David Arredondo.'"  (Id. n.2.)

I conclude that the majority of the court of appeals's reasons for rejecting petitioner's claim are not proper grounds upon which to do so.  First, the trial court's assertion that it had discretion as to whether to reopen petitioner's case is generally true; however, where a court is deciding whether to reopen for the purpose of permitting a criminal defendant to testify, it is limited by Rock.  Thus, even where a defendant has rested – a formality, really – the court should permit the defendant to testify (and therefore also reopen) unless doing so would

-18-

prejudice the prosecution or interfere with the orderly flow of the trial. Of course, where a defendant has rested, permitting him to reopen and testify will quite frequently interfere with the orderly flow of the trial – interrupting closing arguments, etc. However, where it does not, the defendant should be permitted to reopen and testify. See Ortega, 843 F.2d at 259-62 n.2 (stating that where the defendant moved to reopen shortly after resting, the request "could not have been more timely made" and that "we . . . view the trial judge's refusal to reopen the evidence to include Ortega's testimony as an abuse of discretion"). In the present case, petitioner's request to reopen also could not have been more timely made. Therefore, the trial court should not have relied on its discretion in denying petitioner's right to testify and the court of appeals unreasonably considered this factor to be significant.

Further, the fact that petitioner previously waived his right to testify had little or no effect on petitioner's right to revoke such waiver, except to the extent that it prejudiced the prosecution or interfered with the trial. Certainly, if petitioner had waived his right to testify at the court's initial colloquy, and then immediately afterwards, prior to resting his case, changed his mind, his waiver would not be a reasonable ground upon which to deny the right to testify. Given the significance of the decision, it would be surprising if defendants did not sometimes change their minds about testifying. Related to this, I disagree with the court of appeals that petitioner's supposed attempt to "manipulate the system" deprived him of the right to testify. Under Rock, the right to testify is no less fundamental when the defendant is contumacious (or mendacious) as when he is sympathetic. See Ortega, 843 F.2d at 261 (stating that although "[w]e are sympathetic to the problems which contumacious parties can create in a courtroom . . . a contentious defendant has no fewer rights than a sympathetic one").

-19-

Finally, the court of appeals inappropriately considered the value of petitioner's testimony. Because the "accused's right to present his own version of events in his own words" is fundamental, Rock, 483 U.S. at 53 n.10, the likely value of a defendant's testimony is irrelevant to whether a defendant may exercise the right. In any case, if a court reviewing a denial of a defendant's request to testify may consider the value of the proffered testimony (however value is measured), it appears that it should do so in the context of harmless error analysis rather than as a factor in the Rock balancing test, as I discuss further below. See Ortega, 843 F.2d at 262 (stating that denying a defendant's request to testify must be examined in light of the harmless error standard).

However, the court of appeals did appropriately consider the prejudice to the state, the "system" and the jury. While the prosecutor did not object to defendant's request to testify, he indicated that he may need to call up to ten additional witnesses and that he had been unable to relocate all of them. While I would not consider this sufficient prejudice to justify denying petitioner his right to testify, I cannot find that the court of appeals was unreasonable in concluding otherwise. To permit petitioner to reopen his case would have forced the prosecution to call back the rebuttal witnesses already sent home, disrupting such witnesses lives, and would have kept the jury (which, at that point, was prepared for closing arguments and deliberation) far longer than expected.

And to the extent that this is a close call, it appears that Seventh Circuit precedent holds that the right to testify is subject to harmless error analysis. Ortega, 843 F.2d at 262; see also Barrow v. Uchtman, 398 F.3d 597, 608 n.12 (7th Cir. 2005) (stating that Seventh Circuit precedent "seems to support the . . . view" that a defendant seeking to have his conviction overturned based on a deprivation of the right to testify must show that his "failure

-20-

to testify affected the outcome of the trial") (citing Rodriguez v. United States, 286 F.3d 972, 983-84 (7th Cir. 2002)). In a case after Ortega, but prior to Barrow, the court questioned the idea that the right to testify should be subject to harmless error. Underwood, 939 F.2d at 475. However, it did so in dicta. Id. While I am convinced that subjecting a right to testify to harmless error would substantially weaken if not totally undermine the right and is therefore inconsistent with Rock, Ortega remains the law of this Circuit.

And under a harmless error analysis, even if I found the state court's decision to be unreasonable, I would have to find that the trial court's constitutional error was harmless. In a federal habeas case, "the standard for determining whether habeas relief must be granted is whether . . . the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In the present case, after considering the record as a whole as well as petitioner's proffer of what he would have testified to had he been permitted to testify (Pet'r's Br. Ex. B & C), I conclude that it is highly unlikely that the jury would have reached a different verdict if petitioner had testified and that, therefore, the denial of his request to testify was harmless error. In his proffer, petitioner states that had he testified he would have denied the allegations against him and also would have provided testimony refuting various pieces of incriminating evidence. However, such testimony would not have affected the outcome of the case because the evidence of petitioner's guilt was overwhelming.

The evidence established that the victim was last seen alive on Sunday, May 4, in the company of petitioner and that she and petitioner indicated that they were going to petitioner's house. The evidence further established that the victim was killed in petitioner's room. The

-21-

evidence also established that the victim's body was found in a dumpster next to petitioner's house, wrapped in a blanket, which contained traces of petitioner's semen. In addition, a police officer testified that petitioner acknowledged to him that when you use drugs and drink, accidents happen. Kim Strandberg testified that petitioner had assaulted her in a manner resembling the assault on the victim in the present case. Kurt Moedendorfer, who shared a jail cell with petitioner, testified that petitioner admitted to him that he forced the victim in the present case to have sex with him and that she got angry and threatened to call the police. Finally, the state introduced testimony that the bite marks on the victim's breasts came from petitioner's teeth. In the face of this evidence, petitioner's testimony would not have affected the jury's verdict.

**B.  Ineffective Assistance of Counsel**

Petitioner also argues that his trial counsel was ineffective in (1) failing to advocate for him when he requested to testify and (2) failing to uncover impeaching evidence and failing to cross-examine Moedendorfer. I address petitioner's ineffective assistance claim under the familiar two-pronged test established in Strickland v. Washington, 466 U.S. 668 (1984). In order to prevail, petitioner must establish that his counsel's performance fell outside the "range of competence demanded of attorneys in criminal cases," i.e., that it "fell below an objective standard of reasonableness." Id. at 687-88 (quotations omitted). Under this first "performance" prong, courts are to "indulge a strong presumption" of competence such that "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689 (quotations omitted). Under the second prong of the test, the defendant must demonstrate prejudice – "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

-22-

have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.  A court need not address counsel's performance if it is easier to dispose of an ineffective assistance claim on the ground of lack of sufficient prejudice. Id. 697.

With respect to petitioner's claim that his counsel failed to advocate his case when he asked to testify, the court of appeals concluded that petitioner's counsel did not perform deficiently.  I will only discuss the prejudice prong because I find it easier to dispose of petitioner's claim on that ground.  As previously discussed, I do not doubt that the outcome of the case would have been the same if petitioner had testified.  Even if petitioner's counsel had secured an order from the court permitting petitioner to testify, it would not have affected the result of the case.  Thus, petitioner is not entitled to relief based on this claim.

I turn next to petitioner's claim that his trial counsel was ineffective by failing to uncover evidence impeaching the testimony of Kurt Moedendorfer and failing to cross-examine Moedendorfer.  Respondent argues both that petitioner procedurally defaulted the claim and that it lacks merit.  The court of appeals addressed this claim as follows:

> Arredondo further alleges that his attorney failed to investigate parole-revocation proceedings, which would have revealed that Moederndorfer allegedly lied to Moederndorfer's parole agent concerning some matter other than the facts of this case.  He claims that his attorney should have used the testimony of Moederndorfer's parole agent to impeach Moederndorfer's character for truthfulness.  Arredondo does not elaborate, however, on what the parole agent would have said if called to testify.  When a defendant claims that trial counsel was deficient for failing to present testimony, the defendant must allege with specificity what the particular witness would have said if called to testify. See State v. Flynn, 190 Wis. 2d 31, 48 (Ct. App. 1994).  Arredondo has failed to provide the requisite specificity.

-23-

(internal citations omitted). (Answer Ex. E ¶ 40.) In addition, the court of appeals held "[a]ny sub-issue mentioned by Arredondo in his briefs and not discussed in this opinion was inadequately briefed." (Id. ¶ 22.)

Petitioner's claim fails on the merits. Even if counsel had discovered and used evidence tending to impeach Moedendorfer, for the reasons stated in my discussion of harmless error, it is not reasonably probable that the outcome of the case would have been different. Thus, petitioner is not entitled to relief on this claim.

## C.   Sentencing

In 1996, petitioner was tried and acquitted of sexually assaulting Kim Strandberg. In sentencing petitioner in the present case, the judge, who also presided in the 1996 trial, stated that she disagreed with the verdict in that case and would take petitioner's assault on Strandberg into consideration. Relying on Blakely v. Washington, 542 U.S. 296 (2004), King v. Arizona, 536 U.S. 584 (2002), and Apprendi v. New Jersey, 530 U.S. 446 (2000), petitioner argues that in doing so, the court violated his right to due process because the sexual assault was not a fact found by the jury. He also argues that McMillan v. Pennsylvania, 477 U.S. 79 (1986), requires that when acquitted conduct results in a dramatically increased sentence, such conduct must be proven by clear and convincing evidence.

Respondent first argues that petitioner procedurally defaulted his due process/sentencing claim by not presenting it to the state courts. A federal habeas petitioner must first present his argument to the state courts. Ellsworth v. Levenhagen, 248 F.3d 634, 639 (7th Cir. 2001); Wilson v. Briley, 243 F.3d 325, 327 (7th Cir. 2001); Kurzawa v. Jordan, 146 F.3d 435, 441 (7th Cir. 1998). In the present case, petitioner did not argue in the state courts that due process precluded the trial court from relying on the assault on Strandberg.

-24-

Nor did he cite <u>Blakely</u>, <u>Ring</u> or <u>Apprendi</u>, or claim that petitioner's sentence was "enhanced" as those cases use the term. Thus, petitioner did not present his due process/sentencing claim to the state courts and thus procedurally defaulted it.

Even if petitioner did not procedurally default it, the claim lacks merit. Concerning the claim, the court of appeals stated:

> Arredondo claims that the trial court improperly considered the sexual-assault evidence because it "simply replac[ed] the jury's acquittal conclusion with its own." This argument ignores the well-recognized distinction between the fact-finder's function at the guilt stage, where the fact-finder must determine whether the government has proved a defendant's guilt beyond a reasonable doubt, and the sentencing judge's role, which is to assess the defendant's character using all available information, unconstrained by the rules of evidence that govern the guilt-phase of a criminal proceeding. <u>See</u> <u>Williams v. New York</u>, 337 U.S. 241, 246-47 (1949) (evidentiary rules that limit what a jury may consider in determining whether the government has proven a defendant guilty beyond a reasonable doubt do not so circumscribe a sentencing court).
>
> It is "well established that a sentencing judge may take into account facts introduced at trial relating to other charges, <u>even ones of which the defendant has been acquitted</u>." <u>United States v. Watts</u>, 519 U.S. 148 (1997) (per curiam) (quoted source omitted, emphasis added); <u>see also</u> <u>State v. Marhal</u>, 172 Wis. 2d 491, 501-503 (Ct. App. 1992) ("Information upon which a trial court bases a sentencing decision, as opposed to a finding of guilt, need not, of course, be established beyond a reasonable doubt." Thus, "a sentencing court may consider conduct for which the defendant has been acquitted."); <u>State v. Bobbitt</u>, 178 Wis. 2d 11, 16-18 (Ct. App. 1993) (recognizing validity of rule stated in <u>Marhal</u>).

(Answer Ex. E ¶ 53-54 (internal citations omitted).)

In upholding petitioner's sentence, the state court did not unreasonably apply any decision of the Supreme Court. In imposing sentence, trial courts may consider a wide range of relevant information. <u>Williams v. New York</u>, 337 U.S. 241, 247 (1949), including charges of which the defendant has been acquitted, <u>United States v. Watts</u>, 519 U.S. 148, 152 (1997). Further, sentencing courts are granted wide latitude in imposing sentences within the statutory

-25-

limit.  <u>Apprendi</u>, 530 U.S. at 490.  In the present case, the court imposed a sentence within the statutory limit.  Thus, for this reason also, petitioner is not entitled to relief on his due process/sentencing claim.

## IV.  CONCLUSION

**Therefore,**

**IT IS ORDERED** that David Arredondo's petition for a writ of habeas corpus is **DENIED** and this case is **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 25 day of May, 2007.


/s_____
LYNN ADELMAN
District Judge

-26-